541 So.2d 818 (1989)
STATE of Louisiana
v.
Saul JOHNSON.
No. 87-KA-2770.
Supreme Court of Louisiana.
January 30, 1989.
*820 William J. Guste, Jr., Atty. Gen., Harry F. Connick, Dist. Atty., Beryl McSmith, Jack Peebles, Asst. Dist. Atty., for plaintiff-appellee.
Clyde Merritt, Craig Colwart, New Orleans, for defendant-appellant.
CALOGERO, Justice.
Saul Johnson was indicted by an Orleans Parish grand jury on two counts of first degree murder in connection with the deaths of Sue Windham and Earline Nunn. At trial, the prosecution sought to establish that he murdered Sue Windham while engaged in the perpetration of aggravated rape, and then murdered Earline Nunn while engaged in the perpetration of aggravated kidnapping. At the conclusion of the guilt phase of his bifurcated trial, the jury found defendant guilty on both counts of first degree murder. Following the sentencing phase of the proceedings, the jury unanimously recommended imposition of the death penalty for each murder, finding that numerous statutory aggravating circumstances were applicable to each homicide.[1]
On appeal of his convictions and sentences, defendant raises eighteen assignments of error. The most serious issues raised on appeal concern (1) whether the prosecutor, during his closing rebuttal argument in the guilt phase of the trial, improperly drew the jury's attention to the fact that the defendant did not take the stand and testify on his own behalf; (2) whether the trial judge erred by allowing the jury to examine certain written exhibits during its deliberations, including court documents pertaining to a peace bond proceeding which one of the victims brought against the defendant shortly before his death; and (3) assuming that defendant murdered Earline Nunn, whether the evidence was sufficient to establish that the defendant was engaged in the perpetration of an aggravated kidnapping when he did so.
For reasons hereafter set forth, we hold that that reversible error occurred during the guilt phase of the trial when the prosecutor improperly referred to the defendant's failure to testify on his own behalf. This error vitiates both convictions and requires that defendant be retried on both charges. We also find that the trial court erred by allowing the jury to examine certain written exhibits during its deliberations.
With regard to the evidence, we find that the evidence was constitutionally sufficient to support a first-degree murder conviction *821 for the murder of Sue Windham. Therefore, for the homicide involving that victim, the defendant may be retried for first degree murder.
We find that the evidence was insufficient to support the first degree murder conviction for the homicide involving Earline Nunn, and thus double jeopardy considerations preclude defendant's retrial on the identical charge. However, the evidence was constitutionally sufficient to support a second degree murder conviction for the killing of that victim. So the defendant may be retried for second degree murder on a charge pertaining to that homicide.

Facts
The following is a summary of the pertinent events leading up to defendant's conviction.
On November 27, 1984, a hunter discovered the body of a woman in the woods along Michoud Boulevard, in east New Orleans. The police were notified and it was later discovered that this was the body of Sue Windham. The next day, police discovered the body of Earline Nunn in an area not far from the location of the first body.
As established by the coroner's trial testimony and related exhibits, Sue Windham was killed by three gun shot wounds to the head, all fired at close range by a .38 caliber weapon. An autopsy was conducted on the morning that Sue's body was found. Vaginal swabs revealed the presence of semen and sperm which had been deposited within approximately 36 hours of the autopsy. There was also a recently-inflicted deep bruise on the victim's right thigh.
Earline Nunn died of two gunshot wounds to the head, also believed by the coroner to have been fired from a .38 caliber weapon. This victim had numerous scratches on her body. According to the coroner, these scratches would have been consistent with the victim running through the wooded area in which her body was found.
The coroner estimated that both women died at approximately the same time, some 36 to 48 hours before the first autopsy, which began at 9:55 a.m. on November 27.
The evidence at trial established that defendant, although married to another, had for some time been involved in a stormy relationship with Earline Nunn. Sue Windham was Earline's cousin and shared an apartment with Earline on Dryades Street. The state's evidence against defendant at trial consisted primarily of (1) testimony relating to threats Johnson made against the victims in the weeks prior to the murders; (2) jewelry belonging to both victims that was found in the defendant's car after the murders; and (3) testimony by three individuals, consisting of defendant's sister-in-law and two inmates who were incarcerated in Orleans Parish Prison with defendant, who claimed that defendant had admitted killing both women.
The State also introduced court documents and an affidavit (S-33) which showed that a month before the murders, Earline Nunn had sought to obtain a peace bond against defendant in municipal court. In her affidavit, Nunn alleged that on September 18, 1984, at approximately 7:30 a.m., defendant attempted to throw her over the balcony of her upstairs apartment. The court documents further show that at the time Earline was murdered (on or about November 26, 1984), a hearing in the municipal court case had already been scheduled for a date in December, 1984.
Defendant called three witnesses during the guilt phase of the trial. Two testified that the state witness Henry Foster had routinely acted as an informer for the police. The remaining defense witness, Donald Robertson, testified that shortly after Thanksgiving, 1984 (which was shortly before the estimated date of the murders), he saw Sue and Earline being forced into a car by a man with a gun. He identified the man with the gun as Sue Windham's "supposed-to-be-boyfriend." He described the car as a four-door grayish-blue Oldsmobile.[2] Robinson admitted to having a criminal *822 record that included two first degree murder convictions and an armed robbery conviction.

ASSIGNMENTS OF ERROR

Prosecutor's Comment on Defendant's Failure To Take the Stand (Assignment Ten)
The defendant did not testify on his own behalf during the guilt or penalty phase of the trial. During his closing rebuttal argument in the guilt phase, the prosecutor referred to the fact that the defendant had made statements to several people implicating himself in the deaths of the two women. He then stated that:
I will submit to you that there can be no better evidence in a criminal proceeding but that evidence from the defendant's own mouth, not contradicted by anybody. Nobody came here and contradicted anything that was attributed to him, not one single person. Nobody took the stand.

Defense counsel timely objected to these remarks by the prosecutor, and moved for a mistrial on the ground that the prosecutor had improperly directed the jury's attention to the fact that the defendant did not testify on his own behalf. The trial court denied the motion without reasons.
La.C.Cr.P. art. 770(3) provides that the trial court "shall" declare a mistrial when the prosecutor "refers directly or indirectly to ... [t]he failure of the defendant to testify in his own defense...." Art. 770(3)'s prohibition against such prosecutorial comment safeguards the defendant from unfavorable inferences which might otherwise be drawn from his silence. State v. Fullilove, 389 So.2d 1282 (La. 1980). The rule helps implement the defendant's Fifth Amendment right against self-incrimination, and is constitutionally required. Griffin v. California, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965).
Art. 770(3) prohibits both "direct" and "indirect" references to the defendant's failure to take the stand. When the prosecutor makes a direct reference to the defendant's failure to take the stand, a mistrial should be declared, and "it is irrelevant whether the prosecutor intended for the jury to draw unfavorable inferences from defendant's silence." Fullilove, 389 So.2d at 1284. Nor, in the case of a direct reference, will this Court attempt to determine the effect that the remark had on the jury. Id.
Where the reference to the defendant's failure to take the stand is not direct, this Court will inquire into the remark's "intended effect on the jury" in order to distinguish indirect references to the defendant's failure to testify (which are impermissible) from general statements that the prosecution's case is unrebutted (which are permissible). Id.; see also State v. Jackson, 454 So.2d 116 (La.1984).
When our cases speak of the need to ascertain the "intention" of a prosecutor's reference to the unrebutted nature of the state's case, we of course do not envision the impossible task of reading what was actually in the prosecutor's mind at the time the statement was made. Instead, the test we have employed for determining the "intent" of such a statement is as follows.
In cases where the prosecutor simply emphasized that the state's evidence was unrebutted, and there were witnesses other than the defendant who could have testified on behalf of the defense but did not do so, we have held that the prosecutor's argument did not constitute an indirect reference to the defendant's failure to take the stand. See, e.g., State v. Jackson, 454 So.2d 116, 118 (La.1984); State v. Smith, 433 So.2d 688 (La.1983); State v. Latin, 412 So.2d 1357 (La.1982).
On the other hand, where the defendant is the only witness who could have rebutted the state's evidence, "a reference to the testimony as uncontroverted focuses the jury's attention on the defendant's failure to testify" and mandates a mistrial. State v. Perkins, 374 So.2d 1234, 1237 (La.1979). See also State v. Fullilove, 389 So.2d 1282 *823 (La.1980); State v. Harvill, 403 So.2d 706 (La.1981).
In Harvill, for example, the sole evidence which the state presented against defendant was his taped confession. In closing argument, the prosecutor told the jury: "Did you hear one word up there today that said it wasn't true? One word? You didn't." Agreeing with the defendant's argument that the prosecutor's remarks warranted a mistrial, we reasoned that:
The prosecutor's reference to the unrebutted character of the State's evidence was clearly a comment upon the failure of the defendant to testify in his own defense, as only the defendant could recant the taped confession which formed the entirety of the prosecution's case against him. 403 So.2d at 711.
In this case, the challenged statements of the prosecutor focused on the absence of testimony in rebuttal to the testimony of those state witnesses who said that the defendant told them that he committed the crimes. Those witnesses were Dorothy Johnson (defendant's sister-in-law), and two inmates, John Williams and Henry Foster. Johnson testified that defendant told her in a conversation at her home that he committed the murders. There were no other persons assertedly present at time of this conversation. Nor were there any other persons assertedly present on the separate occasions when defendant admitted to Williams and Foster that he committed the crimes.
It is obvious, then, that the only person who could have contradicted the testimony of these witnesses about what the defendant told them was the defendant himself. By emphasizing that the testimony of these witnesses was unrebutted ("Nobody came here and contradicted anything that was attributed to him [defendant], not one single person. Nobody took the stand."), the prosecutor indirectly referred to the defendant's failure to take the stand in violation of Art. 770(3).
Art. 770(3) provides that a mistrial "shall" be declared when the prosecutor indirectly refers to the defendant's failure to testify on his own behalf. Because there was such a reference here, the trial court's failure to declare a mistrial constitutes reversible error. See State v. Fullilove, 389 So.2d 1282 (La.1980); State v. Perkins, 374 So.2d 1234 (La.1979).
Certain language in the majority opinion in State v. Jackson, 454 So.2d 116 (La.1984) indicates that a violation of Art. 770(3) can be considered harmless error in a case where the evidence of the defendant's guilt is "overwhelming." Id. at 118. However, we question whether such a harmless error inquiry is ever appropriate, for Art. 770(3) mandates a mistrial, at that point in the trial when the motion is urged, in any case in which the prosecutor makes a direct or indirect reference to the defendant's failure to testify. When such an improper reference is made, the trial judge does not have discretion to deny the motion based on his perception that the error may prove to be harmless, a speculative judgment at best. Nor does the Code of Criminal Procedure allow the trial judge to attempt to minimize the effect of the error by simply admonishing the jury to disregard the prosecutor's remarks.
Even if the harmless error doctrine is applicable to this issue in some cases, we cannot say that the prosecutor's improper reference to this defendant's failure to take the stand was harmless. The evidence against defendant consisted primarily of the testimony of certain witnesses regarding what the defendant had told them about the crimes, as well as certain other evidence, all circumstantial or peripheral. We can hardly conclude that the prosecutor's improper reference to the defendant's failure to take the stand and contradict the testimony of those who claimed that he had confessed the crime to them, was "harmless beyond a reasonable doubt." State v. Lee, 524 So.2d 1176, 1191 (La.1987); State v. Gibson, 391 So.2d 421 (La.1980).

Evidence Viewed By Jury During Deliberations (Assignment of Error Number 11)
In this assignment defendant complains that the trial judge erred by allowing *824 the jury to review certain pieces of evidence during deliberations. The record reflects that the trial judge allowed the jury to review the following exhibits in the jury room: the autopsy report on each victim (S-4 and S-8), the crime lab report (S-3) and the municipal court documents pertaining to Earline Nunn's request for the issuance of a peace bond against the defendant (S-32). The documents pertaining to the municipal court proceeding included an affidavit by Earline Nunn in which she attested that the defendant had attempted to throw her off of a balcony during an incident that occurred in September, 1984.
Relying on La.C.Cr.P. art. 793, defense counsel objected to the jury's being allowed to view this evidence in the jury room. Art. 793 provides in pertinent part that:
A juror must rely upon his memory in reaching a verdict. He shall not be permitted to refer to notes or to have access to any written evidence.... Upon the request of a juror and in the discretion of the court, the jury may take with it or have sent to it any object or document received in evidence when a physical examination thereof is required to enable the jury to arrive at a verdict.
The trial judge overruled defense counsel's objection and the jury was allowed to view these exhibits during its deliberations.
The rule expressed by Art. 793 is that "the jury is not to inspect written evidence except for the sole purpose of a physical examination of the document itself to determine an issue which does not require examination of the verbal contents of the document." (emphasis in opinion) State v. Perkins, 423 So.2d 1103, 1109-10 (La. 1982). A jury can examine a written statement to ascertain or compare a signature, or to see or feel it with regard to its actual existence, but not for the purpose of examining its verbal contents. Id.
The rationale for the rule expressed by Art. 793 appears to be the concern that if jurors are allowed to review the contents of written exhibits during their deliberations, they will place undue weight on such exhibits and not decide the case with an even balance concerning all of the evidence, and their own recall thereof. "[T]he Louisiana legislature has made the value-determination that, because of the presumed prejudice, documents received in evidence should be sent to the jury on its request only `when a physical examination thereof is required to enable the jury to arrive at a verdict.'" State v. Freetime, 303 So.2d 487, 489 (La.1974) (emphasis in opinion).
As we have noted in the past, Freetime, 303 So.2d at 489, most other jurisdictions allow jurors to take documents or papers, with the exception of depositions, into the jury room. See 4 Wharton's Criminal Procedure 555 (Torcia 1976); Annt., 37 ALR 3d 238. But the Legislature has not seen fit to change our state's rule, the violation of which has usually resulted in the reversal of the defendant's conviction. See, e.g. Perkins, supra (trial judge committed reversible error by allowing jury to view a copy of defendant's statement in the jury room); Freetime, supra (conviction reversed where trial judge allowed jury to review defendant's confession during deliberations). See also State v. Passman, 345 So.2d 874 (La.1977) (trial judge correctly refused jury's request to examine police radio log).
In this case, there was no need for the jurors to make a "physical examination" of the exhibits in question in order to arrive at a verdict. The only way in which these exhibits could be of any assistance to the jurors during their deliberations is if they were examined for their verbal contents. Such an examination is prohibited by Art. 793. Therefore, the trial judge erred by allowing the jury to examine these documents in the jury room.
This error may have been inconsequential with regard to the autopsy and crime lab reports, as those documents, although necessary to the prosecution's case, were not directly pertinent to the issue of this defendant's guilt or innocence. The court documents from the municipal court peace bond proceeding, however, contained an affidavit in which the victim asserted that defendant had attempted to seriously harm her shortly before the murder. Certainly this is the kind of written document which *825 should not be examined for its verbal contents under the rule provided by Art. 793, a rule which presumes that the jury will give undue weight to any written exhibit which it examines for its verbal contents during deliberations.
Because we have independently concluded that the prosecuter's reference to the defendant's failure to take the stand requires the reversal of both convictions, it is unnecessary for us to determine whether the violation of Art. 793, standing alone, warrants reversing defendant's convictions. On retrial, however, the jury should not be allowed to examine the verbal contents of written exhibits during deliberations.

Sufficiency of Evidence (Assignment 12)
Defendant alleges that the evidence was insufficient to support the guilty verdicts. The constitutional standard for testing the sufficiency of the evidence requires that a conviction be based on proof sufficient for any rational trier of fact, viewing the evidence in the light most favorable to the prosecution, to find the essential elements of the crime charged beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed. 2d 560 (1979); State v. Rosiere, 488 So.2d 965, 968 (La.1986).
In order to establish that the defendant was the perpetrator, the state presented three witnesses who testified that he told them that he had killed the victims. The state also linked the defendant to the crimes through the jewelry belonging to the victims which was found in his car. This evidence was sufficient for a rational juror to conclude beyond a reasonable doubt that defendant was the person who killed both women. Similarly, the gun shot wounds to the heads of both women, inflicted at close range, demonstrate that the killer acted with specific intent to kill or inflict great bodily harm.
Thus the evidence was sufficient to establish that defendant committed both murders and acted with specific intent. The remaining question is whether the state presented sufficient evidence to establish that both of these specific intent homicides constitute first degree murder as defined by La.R.S. 14:30.
The evidence was also sufficient to establish that defendant murdered Sue Windham while he was engaged in the perpetration of an aggravated rape. La.R.S. 14:30(A)(1). Thus the evidence was constitutionally sufficient to support the first degree murder conviction for the Windham homicide.
With respect to the Earline Nunn homicide, the state sought to prove at trial that Nunn was the victim of first-degree murder because she was killed while the offender was engaged in the perpetration of aggravated kidnapping. La.R.S. 14:30(A)(1). The aggravating kidnapping claim was the only basis on which the state relied to establish that this homicide was first-degree murder. The state did not argue that the homicide qualified as first-degree murder under any of the other circumstances enumerated under La.R.S. 14:30(A)(2)-(5). Nor did the judge instruct the jury on any possible basis other than aggravated kidnapping for finding that this homicide qualified as first-degree murder.
La.R.S. 14:44 defines aggravated kidnapping as follows:
Aggravated kidnapping is the doing of any of the following acts with the intent thereby to force the victim, or some other person, to give up anything of apparent present or prospective value, or to grant any advantage or immunity, in order to secure a release of the person under the offender's actual or apparent control:

(1) The forcible seizing and carrying of any person from one place to another; or
(2) The enticing or persuading of any person to go from one place to another; or
(3) The imprisoning or forcible secreting of any person.
(Emphasis added)
The jury could have found, based on Foster's testimony, that defendant's conduct satisfied part of the definition of aggravated kidnapping, i.e., "forcible seizing and carrying of any person from one place to *826 another." According to Foster, defendant admitted to tying up Earline and forcibly taking her to the area where the bodies were found.
However, there was no evidence in support of a critical element of aggravated kidnapping: that the perpetrator seized the victim with the intent of forcing the victim or some other person to give up anything of value in order to secure the victim's release.
The state argued at trial that "something of value" which the defendant sought to force Earline to relinquish was her plan to testify against him in judicial proceedings (the peace bond proceeding, and as a witness against him with respect to Sue's death). We find this argument unpersuasive. It may be that defendant's desire to prevent Earline from testifying against him in future judicial proceedings was a motive for the murder of this victim. Even if that were so, however, forcing the victim to relinquish her plan to testify by taking her life can hardly be construed as seeking something of value from the victim or another person in order to secure the victim's release. Without such evidence, there is no aggravated kidnapping.
At trial the State did not argue that any other circumstance qualified the Nunn homicide as first-degree murder. In his instructions on the charge involving Earline, the trial judge informed the jury that first-degree murder is a murder committed when the offender is engaged in the perpetration of aggravated kidnapping. Thus the jury's first degree murder conviction on this charge had to be based on an implicit finding that the offender was engaged in the perpetration of an aggravated kidnapping.[3] The jury's verdict on this charge is not supported by the evidence and must be set aside.
Perhaps the state could have attempted to prove at trial that this homicide was a first-degree murder because it was committed under circumstances where "the offender has a specific intent to kill or to inflict great bodily harm upon more than one person." La.R.S. 14:30(A)(3). We have held that this statutory definition of first-degree murder is satisfied when "the murderer specifically intended to kill more than one person and actually caused the death of one person and the risk of death or great bodily harm to at least one other person, all by a single act or by a series of acts in a single consecutive course of conduct." State v. Williams, 480 So.2d 721, 726 (La.1985).
The state did not rely on La.R.S. 14:30(A)(3) at trial and the jury was never informed of this statutory basis for first degree murder. However, in the penalty phase of the trial, one of the statutory aggravating circumstances which the jury found applicable to each homicide was that defendant "knowingly created a risk of death or great bodily harm to more than one person." La.C.Cr.P. art. 905.4(A)(4). In Williams, 480 So.2d at 726, we held (and logic supports the proposition) that the same conduct which satisfies La.R.S. 14:30(A)(3)'s definition of first degree murder (specific intent to kill or inflict bodily harm on more than one person) also satisfies the aggravating circumstance set forth in Art. 905.4(A)(4) (knowingly creating a risk of death or great bodily harm to more than one person).
Note, however, that the reverse is not necessarily true. Although the two statutory provisions are somewhat similar, conduct by which the defendant knowingly creates a risk of great bodily harm to more than one person [Art. 905.4(d)] need not always be under circumstances where there is specific intent to kill or inflict bodily harm on more than one person [La. R.S. 14:30(A)(3) ]. The aggravating circumstance set forth in Art. 905.4(A)(4) encompasses a broader range of conduct than the first degree murder definition set forth in La.R.S. 14:30(A)(3).
*827 It can be be argued that the jury's finding in the penalty phase that defendant knowingly created the risk of death or great bodily harm to more than one person under art. 905.4(A)(4) indicates that it might have found the evidence to support specific intent to kill or inflict bodily harm on more than one person, and it would have relied upon La.R.S. 14:30(A)(3) to support the first degree murder conviction if it had been aware of that particular definition of first degree murder.[4] We conclude, however, that where the evidence is insufficient to establish first-degree murder under the only definition of that crime which was argued or provided to the jury, the conviction cannot be upheld based on speculation about what verdict the jury would have returned if it had been informed of a different statutory basis for concluding that the defendant's crime constituted first degree murder. And, more importantly, even if we were to somehow "borrow" the jury's finding in the penalty phase and make it that of the jury in the guilt phase, there would still be a deficiency, inasmuch as knowingly creating a risk of death or great bodily harm to more than one person (which the jury found in the second phase of the trial) does not of necessity encompass specific intent to kill or inflict bodily harm on more than one person (the requisite finding in the guilt phase to qualify the crime as first degree murder).
In every homicide case, the prosecutor is free to attempt to establish that the defendant's conduct satisfied any or all of the definitions of first degree murder contained in La.R.S. 14:30(A)(1)-(5). Here the prosecution chose to seek a first-degree murder conviction on this charge based only on an aggravated kidnapping theory, one which was wholly unsupported by the evidence. When the prosecution chooses to limit its case in this fashion, a defendant cannot be convicted of first degree murder based on assumptions about what the jury would have found if the prosecution had presented its case differently.[5]
Even if the jury had been given the opportunity to determine in the guilt phase that defendant acted with specific intent to kill more than one person, we would still have to resolve whether the evidence was sufficient to support a finding that the defendant committed both murders "by a series of acts in a single consecutive course of conduct." That inquiry would present a close issue in this case, one which we would perhaps decide in favor of the state.[6] But *828 we need not resolve that question here. The fact is that the jury was never given the opportunity to make a determination of whether the defendant's conduct satisfied La.R.S. 14:30(A)(3), and, as discussed above, the jury's penalty phase finding that defendant knowingly created a risk of death or great bodily injury to two or more persons cannot be "borrowed" and applied to the guilt phase.[7]
In Baldwin v. Blackburn, 653 F.2d 942 (5th Cir.1981), the United States Court of Appeal for the Fifth Circuit relied upon a jury finding in the penalty phase that the defendant committed the murder while engaged in the perpetration of an armed robbery as a basis for upholding the defendant's first degree murder conviction. At the time that defendant Baldwin was tried, La.R.S. 14:30 defined first-degree murder as a specific intent homicide, punishable by death or life imprisonment. The statutory factors which now distinguish first degree murder from all other homicides, La.R.S. 14:30(A)(1)-(5), were not set forth in the first-degree murder statute. Second-degree murder, punishable by life imprisonment, was defined in pertinent part as a specific intent homicide "under circumstances that would be first degree murder under Article 30, but the killing is accomplished without any of the aggravating circumstances listed in Article 905.4 of the Louisiana Code of Criminal Procedure." La.R.S. 14:30.1(B) (prior to 1978 amendment). One of the aggravating circumstances under Art. 905.4 was that the offender was engaged in the perpetration of an armed robbery.
In Baldwin, the prosecution presented evidence during the guilt phase of the trial which demonstrated that the murder occurred while the offender was engaged in the perpetration of an armed robbery. At the close of the guilt phase, the trial court instructed the jury that first-degree murder was the killing of a human being where the perpetrator acted with specific intent. The trial judge also instructed the jury that second degree murder was a specific intent homicide which would be first-degree murder but for the fact that none of the aggravating circumstances listed in L.C.Cr.P. art. 905.4 were present. The trial judge, however, did not tell the jury, prior to its guilt determination, what the aggravating circumstances under La.C.Cr.P. art. 905.4 were which qualified a homicide as first degree murder. In the guilt phase of the trial, then, the jury arguably was not given a sufficient explanation of the difference between first and second degree murder. At the conclusion of the guilt phase of the trial, the jury convicted the defendant of first degree murder.
At the conclusion of the penalty phase of the trial, the jury found that the murder was committed while the offender was engaged in the perpetration of an armed robbery, and recommended the imposition of the death penalty.
*829 In upholding the defendant's conviction and sentence, the federal appellate court stated that:
The jury's combined findings in the guilt and sentencing portions of the trial permitted the imposition of the death penalty on appellant. The aggravating circumstance that led them to the imposition of this punishment existed regardless of when the jury was instructed to consider it, and it was necessarily a part of their determination of guilt. 653 F.2d at 952.
Baldwin is distinguishable from this case because the aggravating circumstance found in the penalty phase (offender engaged in the perpetration of an armed robbery) was identical to the statutory definition which qualified the homicide as first degree murder. Art. 905.4 served two functions. It set forth the circumstances which distinguished first degree murder from second degree murder, and, simultaneously, it recited the necessary aggravating circumstances for the purpose of the sentencing inquiry. The Fifth Circuit concluded that, under this statutory scheme, the defendant's conviction and sentence should be upheld as long as the jury was instructed at some point in the proceedings to consider whether the offender was engaged in the perpetration of an armed robbery. In this case, of course, the jury was never instructed to consider whether the defendant acted with specific intent to kill or inflict great bodily harm upon more than one person. As we have already noted, the aggravating circumstance of knowingly creating the risk of death or great bodily injury to more than one person [Art. 905.4], which was a jury finding in the second phase of the trial after instructions thereon, is similar, but not the same as La.R.S. 14:30(A)(3).

Conclusion
The trial court's refusal to grant a mistrial after the prosecutor's improper reference to the defendant's failure to testify requires us to reverse both convictions and remand for new trials. Because we have found that the evidence was insufficient to support a finding that the murder of Earline Nunn was committed while the offender was engaged in the perpetration of an aggravated kidnapping, and because the jury did not find under R.S. 14:30(A)(3) that the defendant acted with specific intent to kill more than one person, double jeopardy bars defendant's retrial for first degree murder in connection with that homicide. He may be retried on a charge of second degree murder for Earline Nunn's death, and first degree murder for Sue Windham's death.

Decree
Defendant's convictions and sentences on both counts of first degree murder are reversed, and the case is remanded for a new trial for each or both homicide charges within the limits expressed in this opinion.
CONVICTIONS AND DEATH PENALTY SENTENCES REVERSED; REMANDED FOR NEW TRIAL.
DIXON, C.J., concurs with reasons.
WATSON, J., concurs and assigns reasons.
MARCUS and LEMMON, JJ., concur in part and dissent in part and assign reasons.
DIXON, Chief Justice (concurring):
I respectfully concur in the opinion, disagreeing with the conclusion that "knowingly created a risk of death or great bodily harm to more than one person" does not mean the same as "the offender has the specific intent to kill or to inflict great bodily harm upon more than one person."
If a person knowingly does an act he has the specific intent to do it.
Otherwise, I subscribe to the opinion.
WATSON, Justice, concurring.
The statutory law of Louisiana is very strict in its prohibition against the direct or indirect reference to the failure of defendant to testify in his own defense. LSA-C. Cr.P. art. 770(3). My personal belief is that the provision should be modified, but until it is, it seems to me impossible to say that *830 the prosecutor's needless statement "nobody took the stand" is anything but an indirect reference to defendant's failure to testify.
Therefore, I respectfully concur.
MARCUS, Justice (concurring in part and dissenting in part).
I agree with the majority that the prosecutor improperly referred to defendant's failure to testify on his own behalf during the guilt phase of the trial and that the trial court erred by allowing the jury to examine certain written exhibits during its deliberations. These errors require that defendant's convictions and sentences be reversed. I also agree that the evidence is sufficient to support a first degree murder conviction for the death of Sue Windham and that defendant may be retried for her first degree murder.
I disagree with the majority's finding that the evidence was insufficient to support a first degree murder conviction for the death of Earline Nunn. I consider that the jury could have found under La.R.S. 14:30(A)(1) that Earline Nunn was killed while defendant was engaged in the perpetration of an aggravated kidnapping in that defendant sought to force Earline to relinquish her plan to testify against him in judicial proceedings (the peace bond proceeding and as a witness against defendant with respect to Sue's death), thus meeting the requirement of La.R.S. 14:44 that the victim "give up anything of apparent present or prospective value."
Moreover, I would find that the prosecution presented sufficient evidence to support a conviction of the first degree murder of Earline Nunn by defendant under La.R. S. 14:30(A)(3), that is, when defendant has "specific intent to kill ... more than one person." The jury found that defendant had the specific intent to kill Earline Nunn since a first degree murder conviction under La.R.S. 14:30(A)(1) requires "specific intent to kill." Likewise, the jury found the defendant had "specific intent to kill" Sue Windham under La.R.S. 14:30(A)(1). Therefore, the record supports that defendant killed a human being (Earline Nunn) when "the offender had a specific intent to kill ... more than one person." Furthermore, the record supports that the deaths of both victims were perpetrated "by a series of acts in a single consecutive course of conduct." Although there was sufficient evidence presented to support a first degree murder conviction for the death of Earline Nunn under La.R.S. 14:30(A)(3) by the jury, the trial judge failed to instruct the jury of this definition of first degree murder (the killing of a human being when the offender had specific intent to kill more than one person) during the guilt phase of the trial. In view of this trial error, defendant may be retried for the first degree murder of Earline Nunn as well as the other victim (Sue Windham).
For the foregoing reasons, I concur in part and dissent in part.
LEMMON, Justice, concurring in part and dissenting in part.
I agree that the district attorney's indirect comment on defendant's failure to testify required the granting of a mistrial and that the trial judge's error in failing to do so warrants reversal of the conviction in this case. I decline, however, to join in the majority's unnecessary suggestion in dicta that such an error can never be harmless.[1]
I disagree that the evidence was insufficient to support the first degree murder conviction for the killing of Earline Nunn. The evidence established beyond a reasonable doubt that the murder was committed when defendant had the specific intent to kill more than one person. La.R.S. 14:30 A(3). The trial court's failure to instruct the jury on this element of the crime arguably constitutes trial error which might entitle defendant to a new trial (which he has already received on other grounds). However, the failure to instruct the jury *831 properly does not make the evidence insufficient. Irrespective of the jury's reasons for returning the verdict of guilty of first degree murder, the state is entitled to retry defendant on that charge as long as the evidence was sufficient to prove his guilt of that crime in the first trial (which it was). I therefore dissent from denying the state the right to retry defendant for the first degree murder of Earline Nunn.
NOTES
[1] For the murder of Sue Windham, the jury found three statutory aggravating circumstances: (1) the offender was engaged in the perpetration of an aggravated rape; (2) the offender knowingly created the risk of death and great bodily harm to more than one person; and (3) the offense was committed in an especially heinous, atrocious and cruel manner. For the murder of Earline Nunn, the jury found four statutory aggravating circumstances: (1) the murder occurred during the course of an aggravated kidnapping; (2) the offender knowingly created the risk of death and great bodily harm to more than one person; (3) the offense was committed in an especially heinous, atrocious and cruel manner; and (4) the victim possessed material evidence against the defendant.
[2] In its rebuttal case, the prosecution called to the stand Walter Tyson, who was Sue's boyfriend at the time of her death. Tyson testified that he had a gray Oldsmobile and that it had two doors rather than four like the car described by Robinson. He stated that he did not murder either victim, did not own a gun and never ordered them into his car.
[3] In his instructions regarding the murder of Sue Windham, the trial judge instructed the jury that first-degree murder is a murder committed when the offender is engaged in the perpetration of an aggravated rape. The jury was given no other definition for first-degree murder at any time during the trial.
[4] The State does not raise these arguments, but we nonetheless address them in this capital case, particularly because the resolution of the issue determines whether defendant can be retried for first degree murder for the Nunn homicide.
[5] Of course, a jury that finds a defendant guilty of first degree murder is not required by law to list the particular circumstance or circumstances under La.R.S. 14:30(A)(1)-(5) on which it relied in reaching its verdict. In a case where the jury is advised of more than one of the circumstances which may constitute first degree murder under that statute, the first degree murder conviction should be upheld if there is sufficient evidence to satisfy any of the definitions of first degree murder provided to the jury. In such a case, the reviewing court will assume that the jury found the existence of facts fitting the statutory definition of the crime which was included in the judge's instructions and which was supported by the evidence. But here, no such assumption can be made, as the jury was told only that first degree murder is a specific intent homicide committed while the offender is engaged in the perpetration of an aggravated rape or aggravated kidnapping, and, with respect to the Nunn homicide, the evidence was insufficient to support a finding that the murder was committed under either of those circumstances.
[6] The only specific evidence as to the sequence and timing of the murders came from the coroner's testimony that both victims died at approximately the same time, and Foster's testimony that the defendant said he murdered Sue first, waited about two hours, transported Earline to the scene where the bodies were found, and killed her there. Accepting Foster's testimony as valid for the purpose of the sufficiency of evidence question, the legal issue would be whether a rational jury could have found beyond a reasonable doubt that both murders were committed "by a series of acts in a single consecutive course of conduct." Williams, 480 So.2d at 726.

While we do not resolve that issue here, we note that the apparent time delay between the two murders is significantly longer than the delay involved in other cases where we have upheld first degree murder convictions under La.R.S. 14:30(A)(3) or penalty phase jury findings under L.C.Cr.P. art. 905.4(d). See, e.g., State v. Perry, 502 So.2d 543 (La.1986) (defendant shot five persons in rapid succession); State v. Lowenfield, 495 So.2d 1245 (La.1985) (defendant's multiple victims were shot while sitting at a table); State v. Williams, 480 So.2d 721 (La.1985) (defendant shot and killed one person in a barroom and immediately fired upon others); State v. Glass, 455 So.2d 659 (La.1984) and State v. Wingo, 457 So.2d 1159 (La.1984) (defendants shot victims to death on bed, one after the other); State v. Welcome, 458 So.2d 1235 (La.1984) (defendant shot and killed first victim; reloaded; chased second victim down the street and shot her); State v. Monroe, 397 So.2d 1258 (La.1981) (two consecutive stabbings); State v. Sonnier, 402 So.2d 650 (La. 1981) (two consecutive shootings); State v. English, 367 So.2d 815 (La.1979) (two consecutive shootings); State v. Martin, 376 So.2d 300 (La. 1979) (four consecutive shootings).
Regardless of the apparent time delay between the two homicides, however, it could be strongly argued that defendant's actions, from the time he arrived at the apartment until the time that he committed the second homicide, constituted a series of acts in a single consecutive course of conduct.
[7] With respect to the jury's penalty phase determination that the defendant "knowingly created a risk of death or great bodily harm to more than one person," we note that the state did not argue the existence of this aggravating circumstance during the penalty phase, just as it had not tried to make a case during the guilt phase for the defendant acting with specific intent to kill more than one person. In his instructions during the penalty phase, however, the trial judge informed the jury of all aggravating circumstances listed under Art. 905.4, and that is what prompted the jury to find that defendant knowingly created the risk of death or great bodily injury to more than one person.
[1] Because the statute provides for a mandatory mistrial when such comments occur, the trial judge erred in denying a mistrial. The mandatory mistrial provision, however, does not automatically mean that an error in denying a mistrial can never be harmless. Harmless error is an entirely different issue to be determined by an entirely different standard.