## STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 10-1150

**STATE OF LOUISIANA**

**VERSUS**

**PAXTON JULES TRAHAN**

**\*\*\*\*\*\*\*\*\*\***

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF VERMILION, NO. 49360
HONORABLE EDWARD B. BROUSSARD, DISTRICT JUDGE

**\*\*\*\*\*\*\*\*\*\***

## SHANNON J. GREMILLION
## JUDGE

**\*\*\*\*\*\*\*\*\*\***

Court composed of Oswald A. Decuir, Elizabeth A. Pickett, and Shannon J. Gremillion, Judges.

**AFFIRMED.**

**Michael Harson**
**District Attorney, 15th Judicial District Court**
**P.O. Box 3306**
**Lafayette, LA 70502-3306**
**(337) 232-5170**
**Counsel for Appellee:**
**State of Louisiana**

**Edward K. Bauman**
**Louisiana Appellate Project**
**P. O. Box 1641**
**Lake Charles, LA 70602-1641**
**(337) 491-0570**
**Counsel for Defendant/Appellant:**
**Paxton Jules Trahan**

**Paxton Jules Trahan**
**Louisiana State Penitentiary**
**Hickory Unit One**
**Angola, LA 70712**
**Pro Se**
**Paxton Jules Trahan**

**GREMILLION, Judge.**

The Defendant, Paxton Jules Trahan, was charged with being a principal to the offense of second degree murder. It was alleged that Defendant kicked in the door of his father's bedroom, and Brady Harrington shot and killed Defendant's father, James Trahan. James's body was subsequently burned and dumped in a river. Defendant plead not guilty. A jury returned a verdict of guilty as charged, and he was sentenced to serve life imprisonment at hard labor, without benefit of probation, parole, or suspension of sentence.

Defendant is now before this court asserting two assignments of error. He contends the trial court erred in denying his motion for mistrial, and the evidence was insufficient to support his conviction of second degree murder. We affirm.

## SUFFICIENCY OF THE EVIDENCE

In his second assignment of error, Defendant contends the evidence presented at trial, when viewed in a light most favorable to the prosecution, was insufficient to support a conviction of second degree murder.

We choose to address the second assignment first because when multiple issues are raised on appeal, and sufficiency of the evidence is one of the alleged errors, the reviewing court should first determine the sufficiency of the evidence. *State v. Hearold*, 603 So.2d 731 (La.1992).

> In evaluating the sufficiency of the evidence to support a conviction, a reviewing court must determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found proof beyond a reasonable doubt of each of the essential elements of the crime charged. *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *State v. Captville,* 448 So.2d 676, 678 (La.1984). Additionally, where circumstantial evidence forms the basis of the conviction, the evidence must exclude every reasonable hypothesis of innocence, "assuming every fact to be proved that the evidence tends to prove." La. R.S. 15:438; *see State v. Neal,* 2000-0674

1

p. 9 (La.6/29/01), 796 So.2d 649, 657, *cert. denied,* 535 U.S. 940, 122 S.Ct. 1323, 152 L.Ed.2d 231 (2002). The statutory requirement of La.R.S. 15:438 "works with the *Jackson* constitutional sufficiency test to evaluate whether all evidence, direct and circumstantial, is sufficient to prove guilt beyond a reasonable doubt to a rational jury." *Neal,* 2000-0674 p. 9, 796 So.2d at 657.

*State v. Draughn*, 05-1825, p. 7 (La. 1/17/07), 950 So.2d 583, 592, *cert. denied*, 552 U.S. 1012, 128 S.Ct. 537 (2007).

Defendant was convicted of second degree murder, which is the killing of a human being when the offender has the specific intent to kill or to inflict great bodily harm. La.R.S. 14:30.1(A). "Specific intent may be established by the circumstances surrounding an accused's actions. *State v. Anderson*, 98-492 (La.App. 3 Cir. 10/28/98), 721 So.2d 1006, *writ denied*, 98-2976 (La. 3/19/99), 739 So.2d 781." *State v. Thomas*, 10-269, p. 7 (La.App. 3 Cir. 10/06/10), 48 So.3d 1210, 1215.

[A]s stated by the Louisiana Supreme Court in *State v. Hampton*, 98-331, p. 13 (La.4/23/99), 750 So.2d 867, 880, *cert. denied*, 528 U.S. 1007, 120 S.Ct. 504, 145 L.Ed.2d 390 (1999):

A person may be convicted of an offense even if he has not personally fired the fatal shot. The law of principals states that all persons involved in the commission of a crime, whether present or absent, are equally culpable. *See* La. Rev. Stat. 14:24. However, the Defendant's mere presence at the scene is not enough to "concern" an individual in the crime. *State v. Schwander*, 345 So.2d 1173, 1174-1175 (La.1977). A principal may be connected only to those crimes for which he has the requisite mental state. *State v. Holmes*, 388 So.2d 722 (La.1980); *State v. McAllister*, 366 So.2d 1340 (La.1978).

*Id*. at 1212.

Charges of obstruction of justice and accessory after the fact stemming from James's murder were dismissed in exchange for Ethan Roy's testimony. Roy testified that he was with Jordan Uriegas when Uriegas received a call from Brady Harrington. Harrington asked Roy and Uriegas to go to Defendant's residence. The two complied

2

with the request. Defendant, Harrington, Roy, Spencer Music, and Mason Bedgood later left the residence in Roy's vehicle and went to eat burgers at Krystal in Lafayette. During the trip, Roy did not hear anyone speak about James, but there was a phone being passed around. Roy was shown photos of something burning and a body lying in the mud. Music and Bedgood were subsequently dropped off.

After the group returned to Defendant's residence, Harrington told Roy that he killed James because he was a nuisance. Harrington then showed Roy the body, which was wrapped up outside. Roy and Harrington went back into the residence and, the two, along with Uriegas, discussed using Roy's truck to dispose of the body. Defendant was present during the conversation, but said nothing.

Roy testified that Harrington subsequently tied up the body with extension cords and put it in the back of Roy's truck. Harrington drove Roy's vehicle to a secluded area, accompanied by Roy, Uriegas, and Defendant. Once at the location, Harrington and Uriegas took the body out of the vehicle and threw it over the side of a bridge. The group then went back to Defendant's residence. Roy testified that Defendant did not assist in the disposal of the body or try to stop the two.

Once back at Defendant's residence, the group sat around. Eventually, "they" started falling asleep, and Roy's father called him to go back to work. Roy subsequently told his father what had occurred, and his father called the police. The next day, Roy spoke to police and brought them to the location where the body had been dumped.

Dane Allen was given immunity for his testimony. He testified that Harrington told him "they" shot James, and, while Defendant cleaned up the room, Harrington burned the body. Allen also testified that Harrington told him "Paxton kicked in the

3

door and Brady did the work to [sic] him." Allen further testified that he helped move the body because Harrington threatened him. Allen indicated that while he was helping Harrington, Defendant was inside the residence. Allen stated, "I'm not too sure what he was doing. I'm pretty sure he was cleaning up the rest of the room and stuff like that." Allen testified that it smelled like bleach, and he had brought bleach to the residence at Defendant's request a day or two before. He indicated Defendant needed the bleach to clean up after the dog.

Allen was then questioned as follows:

Q. Did somebody make a request of you to help move the body from the premises?

A. Yes, Brady did and Mason, Jordan, Ethan - - I think that's about it. I believe that's it. And they were all there whenever they asked me if I could move it. I was like, no, you know, I didn't want to bring it because I already knew about it and I didn't want to have any more involvement than what I did. So I just told them no. And I figured they wouldn't do me anything if somebody - - if more people was [sic] there than just me, Brady and Paxton. So I waited and then - - waited for a little bit and then left the house . . . .

Mason Bedgood was charged with accessory after the fact relating to the murder of James. That charge was dismissed in exchange for his testimony. Bedgood testified that he first learned that a crime had been committed while on the way back from Krystal with Defendant, Roy, Harrington, Music, and Uriegas. Bedgood testified that Harrington initiated the conversation. Harrington stated, "Tell them what we done [sic] last night." "[T]hen they said, 'We shot J.P.'" Bedgood did not recall who made this remark. When asked why James was shot, Bedgood testified as follows:

> To my understanding, there's a bunch of different stories right now. But from that night - - there was two (2) different stories that night. One of them it was because - - I don't know - - I don't remember. I know that at one point Paxton was saying that his dad was driving him

4

crazy and everything he had [sic] his dad messed up and expected to live off of him for free and just a bum and everything.

And at one time, he would just get up and go for two (2) or three (3) years and come back and expect to do it again.

Harrington told Bedgood that Defendant kicked in the door, and Harrington shot James. Bedgood then testified that "[t]hey told me that they went in the room with some bleach or some Clorox . . . and removed all the blood and stuff off the walls and put the body in the back yard with some matches and set it afire." He further testified that, "[a] few of them" talked about getting chains and weights, wrapping the body in a blanket, and throwing it over the bridge. When Bedgood heard this, he requested to be dropped off. Bedgood and Music were subsequently dropped off. Bedgood testified that Harrington's phone was passed around in the vehicle, and there were photos on the telephone of something on a bed with blood and a body on fire.

Bedgood was subsequently asked about his statement to police and whether Harrington actually related the events to him. In response, Bedgood said Harrington was talking and was the leader. Additionally, it was Harrington's idea to tie up the body and dump it. Bedgood further testified that Defendant was present and did not say a word when Harrington said Defendant kicked the door in.

Lieutenant Jo Ann Mathiew testified that she interviewed Defendant. During that interview, Defendant stated that two to three nights before the interview, he, Harrington, and James were at his residence. Defendant and Harrington spoke about James bumming off them, and they were tired of it and upset. Lieutenant Mathiew also testified that Defendant said he and Harrington talked about killing James. Further, Defendant stated that there was a shotgun by the door and that Harrington

5

got up and retrieved the shotgun, walked towards the room, and Defendant heard a gunshot. Harrington returned to the living room and put the shotgun back by the door. Defendant waited five to ten minutes and then went to see if Harrington had shot James. He then stated that Harrington had shot James. Defendant stated that half of James's head had been blown off.

Lieutenant Mathiew testified that Harrington and Defendant subsequently went to sleep. The following day, the two cleaned up the room in which James had been shot. They took the body, the mattress it had been lying on, and the clothes in the closet to the back yard and tried to burn them. Roy later helped wrap the body in a blanket, load it, and dump it off Pine Island Road. They returned to the residence, and Defendant, along with Harrington and Roy, went to sleep. Defendant stated that he was scared, so he waited to go to sleep until after Harrington had done so. Defendant indicated he helped Harrington dispose of the body off Pine Island.

Defendant also informed Lieutenant Mathiew that a couple of years prior to his death, James went to Baton Rouge. Lieutenant Mathiew testified that Defendant was attempting to say that James disappeared as he had done in the past.

Sergeant Elliott Broussard's testimony referenced a trial exhibit depicting the door jamb of the room where James was shot. Sergeant Broussard further testified that police could not determine who forced open the bedroom door. He opined the shotgun was fired from the entrance of the bedroom door. Douglas Lancon was accepted as an expert in firearms identification. He testified that the shell casing found at the scene was fired from the Mossberg Model 835 twelve gauge shotgun found at the residence.

Dr. Joel Carney was accepted as an expert in forensic pathology. Dr. Carney

6

performed an autopsy on James on April 14, 2008. Dr. Carney testified that the shotgun wound to James's head caused extensive destruction from approximately the mid-nose up. The body also had advanced thermal injuries.

In brief to this court, Defendant asserts that Harrington shot James, and the State failed to prove he was a principal to that offense. The State contends Defendant had countless opportunities to contact police and failed to do so. His silence was merely an effort to cover up the crime and portray James's disappearance as a repeat of his having done so in the past. The State also contends that Defendant's statement that James was worthless; his speaking openly about his animosity toward and about killing James; his assistance in cleaning the crime scene, burning the body, transporting the body, and dumping the body; his knowledge of James's disappearance several years prior to the offense and his comments about not missing him then; thinking people would believe James disappeared once again; and, the testimony of witnesses support the jury's verdict.

Clearly, the jury believed the testimony indicating that Defendant discussed killing James; he kicked in the door of James's room; Harrington shot James; Defendant cleaned up the room; during a trip to Lafayette, Harrington told others Defendant kicked in the door of James's room; and, Defendant rode along when the body was dumped. This evidence supports Defendant's conviction as a principal to second degree murder.

**MISTRIAL**

In his first assignment of error, Defendant contends the trial court erred in denying his Motion for Mistrial.

During rebuttal closing arguments, the State discussed the lack of DNA

7

evidence then made the following remarks:

> The way Mr. Guidry talked to y'all, Paxton could have been the State's best witness in the case against Brady. He probably would have been given a medal, even by the president. If he had been so distraught about his dad being killed, if he had taken some action, called the police, I would have had an eyewitness to a crime that he didn't want to commit. That didn't happen.

After those remarks, defense counsel moved for a mistrial, asserting the State mentioned the fact that Defendant did not testify. The State asserted it was speaking about Harrington's case and did not say Defendant failed to testify. The trial court denied the motion for mistrial and said it would admonish the jury.

The trial court then made the following remarks to the jury:

> Ladies and gentlemen, Mr. Ayo made a statement about the defendant would have been a good witness or the best witness in the trial against Brady Harrington. And the State is not allowed to mention to you that the defendant did not testify or should have testified or would have been a good witness in this trial.

> So I don't think what he said was in error, but I just want to tell you so there's no confusion in your mind. That you can make no inference that the defendant should have testified in this case. And you're to disregard any comment that the defendant would have been a good witness at all. Just disregard that, please. Proceed.

In its discussion of prosecutorial references to a defendant's failure to testify in *State v. Mitchell*, 00-1399, pp. 4-5 (La. 2/21/01), 779 So.2d 698, 701-02, the supreme court stated:

> La.C.Cr.P. art. 770(3) provides that the trial court "*shall*" declare a mistrial when the prosecutor "refers directly or indirectly to . . . the failure of the defendant to testify in his own defense . . . ." The purpose behind art. 770(3)'s prohibition against such prosecutorial comment is to protect the defendant's Fifth Amendment right against self-incrimination by preventing attention being drawn directly or indirectly to the fact that the defendant has not testified on his own behalf. *State v. Fullilove*, 389 So.2d 1282, 1283 (La.1980); *Griffin v. California*, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965).

> "Direct" and "indirect" references to the defendant's failure to

8

take the stand are prohibited by article 770(3). *State v. Johnson*, 541 So.2d 818, 822 (La.1989). "When the prosecutor makes a direct reference to the defendant's failure to take the stand, a mistrial should be declared, and 'it is irrelevant whether the prosecutor intended for the jury to draw unfavorable inferences from defendant's silence.' " *Id.* (citing *Fullilove*, 389 So.2d at 1284). When the reference to the defendant's failure to take the stand is not direct, this Court will inquire into the remark's "intended effect on the jury" in order to distinguish indirect references to the defendant's failure to testify (which are impermissible) from statements that are not (which are permissible, though not favored). *Johnson*, 541 So.2d at 822; *Fullilove*, 389 So.2d at 1284; *State v. Jackson*, 454 So.2d 116, 118 (La.1984). In order to support the granting of a mistrial, the inference must be plain that the remark was intended to focus the jury's attention on the defendant's not testifying. *State v. Smith*, 327 So.2d 355, 362 (La.1975) (on rehearing); *State v. Reed*, 284 So.2d 574, 576 (La.1973); *State v. Howard*, 262 La. 270, 263 So.2d 32 (1972).

There are indirect references which focus on, or are intended to focus on a defendant's failure to testify. One such instance is when the defendant is the only witness who can rebut the state's evidence. Such a reference to the testimony as uncontroverted focuses the jury's attention on the defendant's failure to testify and warrants a mistrial. *State v. Perkins*, 374 So.2d 1234, 1237 (La.1979); *Fullilove*, 389 So.2d at 1284; *State v. Harvill*, 403 So.2d 706, 711 (La.1981). Then, there are and can be indirect references which are not intended to focus on a defendant's not testifying. One such frequently seen instance is a prosecutor's emphasizing that the State's evidence is unrebutted in a situation where there are witnesses other than the defendant who could testify on behalf of the defense, but have not. *See, e.g., State v. Jackson*, 454 So.2d 116, 118 (La.1984); *State v. Smith*, 433 So.2d 688, 697 (La.1983); *State v. Latin*, 412 So.2d 1357, 1363 (La.1982). Also "[s]tatements in argument to the effect that there is no refuting evidence does not constitute an impermissible reference to the defendant's failure to testify." *State v. Reed*, 284 So.2d 574, 576 (La.1973) (citing *State v. Cryer*, 262 La. 575, 263 So.2d 895 (1972)).

In *State v. Smith*, 433 So.2d 688 (La.1983), the defendant argued the trial court erred in failing to grant his motion for mistrial based on alleged references by the State in its closing argument to the defendant's failure to testify in his own behalf or to call witnesses in his own behalf. The defendant referenced the following passages from the State's closing argument:

Now, after the bank is robbed they run outside carrying money

bags, you remember. Jessie Lee Smith, according to all of the witnesses, of course, the only one testified was Leroy as far as what actually happened in the bank, as far as the criminals themselves were concerned, Leroy said that Jessie is out—out in the car waiting.

* * *

[H]ave you see [sic] any evidence that will give you any reasonable doubt as to who [sic] that money got in Jessie's apartment, in Jessie's suit bag. Have you heard any evidence whatsoever as to how that money got in there if it wasn't the way that everybody said it was, because of the bank robbery? In Jessie's suit bag? How about the money that got in his wife's purse, bait money? Have you heard any evidence, any testimony, any reasonable testimony that will give you some reasonable doubt as to how that money got in that purse. I'll tell you how it got in the purse, he stole the money and he got his share and he gave some of the money to his wife. That's how it got in there. Did Leroy Jackson, I mean Leroy King, the sixteen year old boy, come in here and give you an explanation. He was there. Did he come in here and tell you no, they never brought him that money, or no, I didn't put that money order in the album. How about Jessie's sisters from Magnolia, did they come up here and testify and tell you that he didn't—he didn't take the car that morning. I mean these are his sisters.

Don't you think if they could say they would have taken the stand and said it. Did they come here and say no Jessie didn't come and get my car and drive it to Magnolia, and no Jonah didn't call me the next morning and say my—your brother committed an armed robbery and come get your car. You don't think they would have called them to testify if—if that had been the case. They didn't contradict any of Jonah's story. Was there any testimony of witnesses placing this defendant any other place other than being in Magnolia and at the Bank of—First State Bank of Plain Dealing at the time of the robbery? No.

*Id*. at 697.

The supreme court found the prosecutor's comments were directed to the lack of evidence on the defendant's behalf. The court noted that where the defendant himself is not the only witness who might take the stand to refute the State's case, argument to the jury that the State's presentation of the facts is uncontroverted does not focus the jury's attention on the defendant's failure to testify. The court further noted there were many witnesses the defendant could have called to refute the State's

case, and the State's argument focused principally on the uncontroverted nature of its presentation of the facts. The court found that even if it were to assume, arguendo, that the State's argument referred ambiguously to the defendant's failure to testify, it was not plain from the record that the references, if any, were intended to focus the jury's attention on the defendant's failure to testify or present evidence on his behalf.

In the context of the State's rebuttal argument, the comments by the State were a permissible comment on Defendant's statement to police and the unrebutted evidence. They were not intended to call the jury's attention to Defendant's failure to testify in his own behalf. This assignment of error lacks merit.

## DECREE

Defendant's conviction is affirmed.

**AFFIRMED.**