584 So.2d 686 (1991)
STATE of Louisiana
v.
Kirby LAMARK.
No. KA 90 1030.
Court of Appeal of Louisiana, First Circuit.
June 27, 1991.
Writ Denied October 11, 1991.
*688 Bryan Bush, Dist. Atty. by Glenn Lorio, Asst. Dist. Atty., Baton Rouge, for plaintiff/appellee.
*689 Office of Public Defender, Baton Rouge, for defendant/appellant.
Before EDWARDS, WATKINS and LeBLANC, JJ.
LeBLANC, Judge.
Defendant, Kirby Lamark, was charged by indictment with (Count I) aggravated rape, a violation of LSA-R.S. 14:42; (Count II) aggravated crime against nature, a violation of LSA-R.S. 14:89.1; and (Count III) aggravated burglary, a violation of LSA-R.S. 14:60. Following trial by jury, defendant was convicted as charged on all three counts. Subsequently, the trial court sentenced defendant to terms of imprisonment at hard labor as follows. Defendant received a sentence of life without benefit of parole, probation or suspension of sentence for the aggravated rape; fifteen years without benefit of parole, probation or suspension of sentence for the aggravated crime against nature; and thirty years for the aggravated burglary. The court ordered that the sentences for the aggravated rape and aggravated burglary be served concurrently and that the sentence for the aggravated crime against nature run consecutively to those sentences. Defendant has appealed his convictions and sentences, urging nine assignments of error:
1. The trial court erred by finding defendant competent to proceed.
2. The trial court erred by denying defendant's motion to suppress statements.
3. The trial court erred by denying defendant's motion to quash.
4. The trial court erred by denying defendant's motion for mistrial.
5. The trial court erred by allowing the state to introduce defendant's taped statement into evidence.
6. The trial court erred by allowing the state to introduce evidence over defense counsel's objection.
7. The trial court erred by denying defendant's motion for mistrial.
8. The trial court erred by denying defendant's motion for a new trial.
9. The trial court erred by imposing excessive sentences and failing to comply with the sentencing guidelines in LSA-C.Cr.P. art. 894.1.
The record reflects that on June 13, 1985, at some time shortly after 2:00 a.m., Jane Doe[1] was alone in her home in Baton Rouge. At that time, while asleep in bed in her bedroom, she was awakened when she heard a noise. She turned on a bedside lamp, looked around and assumed the noise was from the street because due to the hot weather she had left the windows to her house open with the window screens apparently latched. Doe turned off the lamp and lay back down on her bed. A minute or two later she heard another noise from a different direction. She sat up and turned on the lamp again. When she looked around, she saw a man on the side of her bed. The man stood up and ran around the bed. Doe jumped out of bed, yelled, and grabbed a cane ("like a walking stick") that was on the side of her bed. Wielding the cane, Doe struck the man over his shoulder with the cane. However, he responded by putting a single blade, folding knife to her throat, grabbing her wrists, pushing her against the bedroom wall; and threatening to kill her if she screamed or did anything.
According to Doe, the man was wearing a shirt, a bandanna around his face, socks and either shoes or tennis shoes. When she struck the man, the blow apparently caused the bandanna that he was wearing around his face to slip down, but the man quickly raised the bandanna and turned off the light in the bedroom. He kept his hand pressed against her and told her to get on the bed. Doe did as she was told. The man pulled off her underpants and told her he would kill her if she did not do what he wanted her to do. She believed that he could have carried out this threat.
*690 The man then vaginally raped Doe. When he finished raping her, he straddled her over her stomach, picked up the knife which he had laid on the bed and forced Doe to perform oral sex on him.
The man then lay down beside Doe and started talking. He told her that he needed five hundred dollars and that he wanted her to give it to him. Doe answered that she had some change in her purse, which she could get for him; but he would not let her go get the purse. When he questioned Doe as to whether or not she would tell anyone what he had done, she repeatedly told him she would not and asked him not to hurt her. The man vaginally raped Doe again before resuming his conversation with her. During the conversation which followed, the man told her he could not decide if he would let her live but that, if he did allow her to live, he would probably cut her eyes and blind her. He rolled over on his back, rolled Doe over on her back, put his arm over her throat and again told Doe he wanted money. The man started saying he had decided he did not think he could let Doe live; he kept talking and mumbling and finally fell asleep. Doe tried to move from the bed. He awoke and told her to be still and pressed down on her throat. Once again, the man fell asleep. When he moved his arm, which had apparently still been positioned over Doe's throat, Doe slowly began moving off the bed in a manner so as not to awaken the man. After she successfully moved from the bed, Doe slowly and quietly moved to the bedroom door. Once she reached the threshold of the bedroom door, Doe ran through her house to the back of her neighbors' house. Doe told the neighbors she had been raped, and the police were summoned.[2]
According to Doe, it was almost dawn when she ran to her neighbors. About three hours elapsed from the time the rapist entered her home until the time Doe successfully fled from his control.
When the police arrived, they talked to Doe.[3] Thereafter they entered Doe's home and found defendant on the bed in the bedroom. Defendant was wearing a shirt and a red bandanna, which partially covered the bottom of his face. He was wearing neither pants nor underwear and was apparently asleep. The police apparently made enough noise to awaken defendant, who then lunged from the bed toward the officers with the knife in his hand. A struggle between defendant and the officers ensued. It lasted several minutes before defendant was subdued, disarmed, and placed under arrest. The police then took defendant to a hospital for treatment of minor injuries he sustained during the struggle. After defendant received treatment, officers transported him to the detectives' office.
That same morning, after being advised of his Miranda rights from a written advice of rights and consent to questioning form, defendant made an oral, unrecorded statement to Baton Rouge City Police Officers Isabel P. Banks and Elbert Hill. Shortly after giving this statement, defendant made a taped statement to Banks and Hill.
Although the taped statement contains considerable detail, it essentially reveals that on the morning in question, defendant entered Doe's home through her bedroom window after removing the window screen. After entering, defendant went back outside, replaced the window screen and reentered *691 the residence. He went in the bedroom, removed his pants and placed them in the hallway. When Doe apparently became aware there was someone in the room, she turned on the light. He pulled out a knife, asked Doe not to holler, and turned off the light. Defendant started talking to Doe. He got into the bed with the knife in his hand and began having sex with her. He asked her to have oral sex; she complied because she was frightened. Defendant stated that he continued to have sex with Doe. Then defendant asked Doe for money and asked her if she would tell anyone that they had sex. Doe stated that she would keep what had happened between him and her. Defendant then fell asleep in the bed. Although defendant admitted that he pointed the knife at Doe, he denied that he ever threatened to kill her.

ASSIGNMENTS OF ERROR NOS. ONE AND THREE:
By means of these assignments, defendant contends that the trial court erred by denying his motion to quash the indictment. Defendant argues that the motion should have been granted because the trial court's May 5, 1986 determination under LSA-C.Cr.P. Art. 648 B(3) that he lacked capacity to stand trial and the court's order of civil commitment based on that determination precluded any resumption of the instant prosecution.
The record reflects that at a July 15, 1985 sanity hearing, the trial court found defendant lacked mental capacity to proceed and committed defendant to the East Louisiana State Hospital Forensic Section. Subsequently, after notification by the Forensic Section that defendant would not become competent to proceed in the foreseeable future, the trial court conducted a hearing on May 5, 1986, pursuant to LSA-C.Cr.P. Art. 648 B(1). At this hearing, (in accordance with LSA-C.Cr.P. Art. 648 B(3)) the trial court determined that defendant was incapable of proceeding, that he was a danger to himself and others, and that he "never" would be able to regain his capacity to proceed in the foreseeable future. Consequently, the court issued an order of civil commitment, pursuant to Art. 648 B(3), committing defendant to the East Louisiana State Hospital (Hospital) for care and treatment. The order included provisions for periodic review of defendant's capacity and for notification by the superintendent of the Hospital to the court of any discharge or conditional discharge of defendant.
Thereafter, by letter dated May 8, 1989, the Hospital reported to the trial court that defendant was fully capable of participating in his criminal defense and would be discharged in thirty days. On July 28, 1989, defendant filed the motion to quash, at issue in these assignments, asserting that his May 5, 1986 civil commitment precluded further criminal prosecution of the instant offenses. On October 16, 1989, the trial court held another sanity hearing. At this hearing, the trial court found defendant competent to proceed and the instant prosecution was resumed with defendant's arraignment on the charges stated in the indictment. Later, on January 9, 1990, the trial court held a hearing at which defendant's motion to quash was heard and denied by the court.
Defendant's argument is essentially that LSA-C.Cr.P. Art. 648B(3) is self-contained. Noting that Art. 648 B(3) makes no provision for resumption of criminal prosecution of a defendant who is civilly committed pursuant to its provisions, he concludes that the provisions of Art. 649, which provide for the resumption of criminal proceedings against a defendant upon a determination by the court that the defendant has capacity to proceed, are inapplicable to a defendant civilly committed under Art. 648 B(3).
We disagree with the defendant's interpretation of these statutes. Contrary to defendant's assertion, Art. 648 B(3) may not be construed in isolation from the remainder of the statutes regarding a defendant's mental incapacity to proceed. The meaning and intent of a statutory provision is to be determined by a consideration of the statute in its entirety and all other laws on the same subject matter, and a construction should be placed on the provision in question which is consistent with the express *692 terms of the statute and with the obvious intent of the legislature in enacting it. See, State v. Seals, 255 La. 1005, 233 So.2d 914, 918 (1970). See also, State v. Freeman, 411 So.2d 1068, 1072 (La.1982); State v. Brady, 310 So.2d 593, 595 (La. 1975). Clearly, the provisions of LSA-C.Cr.P. Art. 649 providing for the resumption of criminal proceedings against a defendant are applicable to a defendant who has been civilly committed pursuant to Art. 648 B(3). Hence, the trial court did not err by concluding that defendant had mental capacity to proceed, allowing the resumption of the criminal prosecution and denying defendant's motion to quash.
These assignments lack merit.

ASSIGNMENTS OF ERROR NOS. TWO, FIVE AND SIX:
By means of these assignments defendant contends that the trial court erred by denying his motion to suppress his taped statement and the advice of rights and consent to questioning form.[4] Defendant argues that the taped statement and form should have been suppressed because they were the products of physical abuse, threats and intimidation by the police. Alternatively, he submits that he lacked mental capacity to execute the form waiving his Miranda rights and make the taped statement.
Before a confession or inculpatory statement can be introduced into evidence, the state has the burden of affirmatively proving beyond a reasonable doubt that it was free and voluntary, and not made under the influence of fear, duress, intimidation, menace, threats, or promises. LSA-R.S. 15:451; State v. Robinson, 525 So.2d 712, 713 (La.App. 1st Cir.1988). When a defendant alleges police misconduct to obtain a confession or inculpatory statement, the state must specifically rebut such an allegation. See State v. Bennett, 454 So.2d 1165, 1172 (La.App. 1st Cir.), writ denied, 460 So.2d 604 (La.1984).
With regard to the relationship between diminished mental or intellectual capacity and involuntariness, the United States Supreme Court, as well as the Louisiana Supreme Court, has noted that such a condition does not of itself vitiate the ability to knowingly and intelligently waive constitutional rights and make a free and voluntary confession or inculpatory statement. See Colorado v. Connelly, 479 U.S. 157, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986); State v. Benoit, 440 So.2d 129, 131 (La.1983); State v. Young, 469 So.2d 1014, 1018 (La. App. 1st Cir.1985). The critical factor is whether the defendant was able to understand the rights explained to him and voluntarily give his statement. State v. Benoit, 440 So.2d at 131; State v. Robinson, 525 So.2d at 714.
The defendant bears the burden of proving the existence of a mental abnormality which under the circumstances may have destroyed the voluntary nature of his confession. If the defendant fails to prove the existence of a mental illness or defect or fails to prove that such a disorder prevented his confession from being voluntary, the State is not required to negate the defendant's mental abnormality, but the State must in all other respects prove beyond a reasonable doubt that the confession was voluntary. State v. Glover, 343 So.2d 118 (La.1977) (on rehearing).
In the instant case, the trial court concluded that there was no evidence that defendant suffered from any mental disease or mental defect at the time he executed the advice of rights form and made the taped statement. The record supports this conclusion. Thus, the State was not required to negate defendant's claim of mental abnormality. However, we must decide whether defendant's actions were free and voluntary in all other respects, due to defendant's claims of police coercion.
*693 Defendant testified on his own behalf at the suppression hearing. In connection with the struggle which occurred between himself and the police at the victim's residence, defendant testified that he was attacked while asleep, hit in the head by an officer having the first name "John," and kicked in the face by another officer. After he was beaten and threatened, officers took him to the hospital. At the hospital, he was treated for two lacerations on his head, which were stitched and bandaged because of their seriousness. From the hospital, officers took him around Memorial Stadium where the baseball field is located. At that location, the two officers, who had taken him to the hospital, beat him while he was handcuffed and shackled. During this beating, he sustained bruises to his ribs from the officers' kicking him. He was then taken downtown and dragged from the police car used to transport him because he refused to exit the car. After the officers took him into the office, he cooperated with the police out of fear they might do something to him even more drastic than they had already done.
Defendant testified that he made his statement because the officers threatened him. He thought about all the things the officers told him they were going to do to him; he was terrified and felt his life was being jeopardized. Defendant was also afraid, because the officers knew the victim and the people she knew and was aware of the "pull [the victim] had in the system", and he was afraid that, if he told the truth, the officers would have tried to "kill [him] somewhere down the line."
According to defendant's testimony, at the time he made his taped statement, he was not "in [his] right mind" because he was "drugged up or [he] was droopy, [he] was, you know, feeling sick." Defendant stated that he did not know if the condition was caused by something he had to drink at his or the victim's home, but he knew it was not the result of his drinking alcohol. According to defendant, he had no history of using cocaine or marijuana, and he had stopped drinking alcohol after his DWI (arrest or conviction).
Defendant further testified that Officers Banks and Hill made promises to him. They told him that if he did not tell the truth he "was going to get the electric chair" and that they were going to help him; however, they did not tell him what kind of help they would give him. Defendant elaborated that he knew that the (aggravated rape) charge he faced carried a penalty of life imprisonment rather than possible submission to the electric chair and that Banks and Hill (not knowing that he knew the law) were trying to scare him.
Baton Rouge City Police Officer Lane Drake testified that he was involved with other officers in the struggle with defendant to effectuate defendant's arrest. At the time, defendant was armed with a buck knife. The officers had to use force against defendant when defendant jumped toward him with the knife. Drake and two other officers converged on defendant. The struggle continued from the bedroom into the hallway, and only with the assistance of two more officers was defendant finally subdued. During the struggle, defendant suffered minor injuries. As a result of receiving those injuries, defendant was taken from the victim's residence to the Earl K. Long Charity Hospital. Drake was with defendant when he was transported to the hospital and remained with defendant at the hospital. While at the hospital, defendant was treated by a physician but not hospitalized. After defendant was released by the treating physician, the officers transported defendant to the detectives' office, where they relinquished custody of defendant to Officer Banks. The officers made no stops at Memorial Stadium or any park while enroute to or from the hospital. At no time, while Drake was with defendant and particularly while defendant was being taken to and from the hospital, did Drake or any other officers physically abuse defendant.
The testimony of Officers Banks and Hill revealed that, after defendant was taken to the detective office and placed in Banks' custody, Hill became involved in the instant criminal investigation at Banks' request. Only Banks and Hill were present during the interview of defendant which followed. *694 Hill stated that they did not at any time leave the interview room. After the taped interview was concluded, defendant was transferred to parish prison.
Hill testified that defendant arrived at the detectives' office at about 9:00 a.m. Hill initially orally advised defendant of his constitutional rights to make sure defendant understood his rights. Before advising defendant of his rights (a second time) from a written advice of rights and consent to questioning form, Hill questioned defendant as to whether or not he could read and write. Defendant informed Hill he could read and write and had attained a twelfth grade level education. At 9:15 a.m., Hill advised defendant of his rights from the written form. Thereafter, defendant stated that he wanted to make a statement. After defendant made his oral unrecorded statement, defendant made his taped statement which, as reflected on the tape, began at 10:30 a.m.
In their testimony, Banks and Hill each denied that they used (or had knowledge that any other officer had used) force, threats, inducements or promises to obtain defendant's oral unrecorded and recorded statements. Hill testified that, because he had not been present at defendant's arrest, he asked defendant if anyone had threatened him or coerced him to give a statement and defendant answered in the negative. Banks specifically denied that she made any statements to defendant about the electric chair, any threats regarding his possible exposure to the electric chair, or any promises whatsoever. Similarly, Hill testified that he did not mention the electric chair to defendant and that he did not promise to help defendant in any way.
Hill testified that defendant was very cooperative; it seemed he realized he had been caught in the victim's bed and wanted to tell his side of the story. Defendant did not inform Hill that he needed medical attention, and Hill did not observe that defendant had a need for any such attention. According to Banks, defendant did not appear to be in any pain.
Banks testified that defendant was able to carry on a conversation with her and Hill. He voluntarily made his statements. His demeanor was very calm, as were his responses during the interview. He appeared to understand what was going on about him and was able to give details about what had occurred that day. Hill stated that he had no difficulty whatsoever in communicating with defendant during the interview process.
After listening to the taped statement, we observe that defendant's voice on the tape is very clear and coherent. Additionally, as we previously noted in this opinion, defendant's taped statement contains considerable detail concerning his account of the events at the victim's home.
Considering, as we may, all of the evidence presented both at the hearing on the motion to suppress and at trial, we are convinced the state's evidence provided a sufficient basis to support a conclusion that defendant was rational, coherent and able to comprehend the meaning and significance of his statements and knowingly waive his constitutional rights, and that his statements were freely and voluntarily made. Thus, the evidence supports the trial court's ruling denying the motion to suppress and allowing the taped statement and advice of rights and consent to questioning form into evidence.
These assignments lack merit.

ASSIGNMENT OF ERROR NO. FOUR:
By means of this assignment, defendant contends that the trial court erred by denying his objection and motion for a mistrial based on the state's alleged use of peremptory challenges, in violation of Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), to exclude black prospective jurors John LeBlanc, Gerald Blacher, Alice Johnson, Lillian Griffin, Michael Hertzock and Brenda Percy.
A peremptory challenge by the state may not be based solely upon the race of the juror. LSA-C.Cr.P. Article 795(C). In Batson v. Kentucky, the United States Supreme Court reexamined the evidentiary burden placed on a defendant who claims that he has been denied equal protection through the state's exercise of peremptory *695 challenges to exclude members of his race. Formerly, the standard of Swain v. Alabama, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965), placed the burden on the defendant to prove that the state had systematically excluded blacks from juries over a period of time. The Batson Court rejected the Swain standard as a "crippling burden" and held that an equal protection violation occurs when the prosecutor, in the trial of a member of a cognizable racial group, exercised peremptory challenges to remove members of the defendant's race from the jury venire for a discriminatory purpose. The Batson Court set standards for assessing a prima facie case of purposeful discrimination[5] and placed the burden on the prosecution, after such a prima facie showing, to come forward with a neutral explanation for challenging black jurors that related to the particular case. State v. Collier, 553 So.2d 815, 817 (La.1989). Because a trial judge's findings pertaining to purposeful discrimination turn largely on credibility evaluations, such findings ordinarily should be entitled to great deference by a reviewing court. Batson v. Kentucky, 106 S.Ct. at 1724, n. 21.
In order to preserve the complaint that the prosecutor's use of a peremptory challenge was based on racial discrimination, the defense must make a timely objection. LSA-C.Cr.P. Art. 841. State v. White, 535 So.2d 929, 934 (La.App. 2nd Cir.1988), writ denied, 537 So.2d 1161 (La. 1989). To be timely, the objection must be made before the entire jury panel is sworn. State v. Williams, 524 So.2d 746 (La.1988). See also State v. Collier, 553 So.2d at 818 n. 4; State v. White, 535 So.2d at 934.[6]
In the instant case, immediately after the twelfth member of the jury was sworn and before the trial court stated that one alternate juror would be selected, defense counsel entered a Batson objection. Defendant asserts that, because the alternate had not yet been selected, the entire jury panel had not been completed, and, thus, his Batson objection was timely. We disagree. In our view, for a Batson objection to be timely it must be entered before the regular panel members of the jury are sworn, irrespective of whether or not any alternate juror or jurors are to be selected.[7] Nonetheless, we will address the merits of the alleged Batson violation in this case.
The record reflects that defendant is black and that the state used all six of the total of six peremptory challenges it exercised during voir dire to exclude black prospective jurors: LeBlanc, Blacher, Johnson, Griffin, Hertzock and Percy. In articulating his Batson objection, defense counsel relied on the prosecutor's use of the six *696 peremptory challenges to exclude these six individuals allegedly on the basis of their race. Thereupon, the trial court inquired as to whether or not the prosecutor wanted to respond to the objection.
The prosecutor answered in the affirmative and stated for the record his reasons for exercising the six peremptory challenges at issue as follows: (1) LeBlanc indicated that he was treated unfairly by a judge during his prosecution and conviction for a DWI. He was biased against enforcement of the sentence of life imprisonment for aggravated rape, he has a relative serving a sentence in the penitentiary at Angola and he has a friend who was charged with rape. (2) Blacher has a relative who is in prison. In articulating this reason for peremptorily challenging Blacher, the prosecutor remarked that he would rather not have jurors who have relatives and/or friends who are imprisoned. (3) Johnson had testified as an alibi witness during her brother's trial in which he was convicted of armed robbery and is serving a sentence of imprisonment. Noting that the trier of fact obviously had not believed Johnson's alibi testimony, the prosecutor remarked that there was a possibility Johnson had committed perjury. (4) Griffin has a brother who is serving a sentence of imprisonment for having sold cocaine. An additional reason given by the prosecutor for peremptorily excluding Griffin was that she did not have steady employment and was not currently employed. The prosecutor indicated that he preferred having jurors who are employed. (5) Hertzock was unsatisfied with the police in regard to a traffic citation he had received for his car having an expired motor vehicle inspection sticker. On one occasion he had been wrongfully arrested in the past for a crime he did not commit, and his wife was wrongfully arrested three times. Finally, Hertzock stated that he did not wish to serve on the jury. (6) Percy was excluded for the sole reason that she had a thirteen year old daughter who was raped, but she had caused a criminal charge for the offense to be dropped, causing the prosecutor to conclude that she did not think enough of the child or the criminal justice system to prosecute the rapist. The prosecutor felt that he could not expect someone who was not concerned about her own child to convict in the instant case, which involved a victim Percy did not even know. In conclusion, the prosecutor noted that he had accepted three blacks who were on the twelve member jury and that he would have liked to have had more blacks on the jury. However, the prosecutor stated that he felt it was inappropriate for him to select jurors who had relatives in jail and unfortunately, in this case five of the blacks he peremptorily challenged had one or more relatives in jail.
At the conclusion of the prosecutor's statements referenced above, the trial court stated that, when it asked the prosecutor to respond to the Batson objection, it did not expect and would not have required the prosecutor to give neutral explanations for his peremptory challenges. However, the court noted that the prosecutor's statement of reasons made it easier for the court to rule on the Batson claim.
Initially, (citing State v. Collier and State v. Williams) the trial court ruled that defendant's objection after the completion of the twelve person jury panel was untimely. However, even assuming the timeliness of the objection, the court stated that defendant failed to establish a prima facie case of purposeful discrimination under Batson. In any event, the court found that the prosecutor's stated reasons for exercising the six peremptory challenges of blacks were reasonable and valid neutral reasons under Batson. Thereupon, defense counsel objected to the trial court's rulings and findings and moved for a mistrial on the basis of the Batson claim. The trial court denied the motion for mistrial.
In the instant case, the state used all six of the peremptory challenges it used during voir dire to exclude blacks. Nonetheless, three of the regular twelve person jury panel members were black. The alternate juror selected and sworn was also black, and she eventually took the place of one of the white regular panel members who was excused immediately before the defense presented its case. Additionally, *697 during the selection of the regular panel of jurors, the state accepted another black person who was peremptorily excused by the defense. After considering all relevant circumstances present in this case, we agree with the trial court that defendant failed to establish a prima facie case under Batson. Cf. State v. Thompson, 516 So.2d 349, 354 (La.1987), cert. denied, 488 U.S. 871, 109 S.Ct. 180, 102 L.Ed.2d 149 (1988). Furthermore, even assuming arguendo that defendant established a prima facie case, we find no abuse of discretion by the trial court in accepting the state's reasons for peremptorily challenging the six black prospective jurors as neutral explanations under Batson.
Accordingly, this assignment lacks merit.

ASSIGNMENT OF ERROR NO. SEVEN:
In this assignment, defendant contends that the trial court erred by denying his motion for a mistrial based on the prosecutor's comments, during the state's rebuttal closing argument, which referred to defendant's failure to testify. Defendant argues that, because the prosecutor's comments were proscribed by LSA-C.Cr.P. art. 770, his convictions and sentences should be reversed.
Defendant did not testify on his own behalf at trial. During the prosecutor's rebuttal closing argument to the jury, the prosecutor essentially asserted that the defense of consent, upon which defendant relied, had been vitiated by what defendant had said in his taped statement and that, in light of the content of the taped statement, the defense was really saying that defendant (on the tape) and everyone else lied. The prosecutor then argued that defendant told basically what happened in the taped statement, and he stated that defendant did not lie about anything. Reiterating that defense counsel was claiming that defendant lied, the prosecutor added:
... What is (sic) evidence is there that he lied? Everything basically is consistent. This is four and a half years ago. If people got up here and said exactly the same thing about everything that would be questionable. Did Isabel Banks get up here and lie? Did Officer Hill get up here and iie (sic)? In order to disbelieve the statement of Mr. Lamark you have to believe that Officer Hill and Officer Banks overreached, forced this man to make statements about things which weren't true. Ya'll listened to the tape, ya'll heard it. Did it appear that way? And there's the victim. As I said before, and I'll say it again, her testimony was uncontradicted. No one took the stand and said that what she said wasn't true. [emphasis added]
In response, defense counsel immediately objected and requested a mistrial. However, the trial court denied the requested mistrial, admonished the jury to disregard the prosecutor's "last comment," and reserved to defense counsel the opportunity to later state the basis for his objection. After the prosecutor concluded his rebuttal closing argument and before the trial court charged the jury, defense counsel was permitted, out of the jury's presence, to fully state the reasons for his objection and request for mistrial. In giving his reasons to the court, defense counsel stated that, in the instant one on one situation involving only an alleged victim and perpetrator, defendant was obviously the only person who could rebut what Doe said in her testimony. Thus, the prosecutor was obviously saying to the jury that defendant did not take the stand. Following the articulation of these reasons by defense counsel, the court asked the prosecutor if he wanted to respond and the prosecutor replied in the negative. The trial court then stated that it did not feel that the prosecutor's comments constituted grounds for a mistrial and that, because of its prior instructions to the jury and the jury instructions which would follow concerning defendant's right to not testify, the admonition to the jury was sufficient.
LSA-C.Cr.P. Article 770 provides, in pertinent part:
Upon motion of a defendant, a mistrial shall be ordered when a remark or comment, made within the hearing of the jury by the judge, district attorney, or a *698 court official, during the trial or in argument, refers directly or indirectly to:
* * * * * *
(3) The failure of the defendant to testify in his own defense;
* * * * * *
An admonition to the jury to disregard the remark or comment shall not be sufficient to prevent a mistrial. If the defendant, however, requests that only an admonition be given, the court shall admonish the jury to disregard the remark or comment but shall not declare a mistrial.
LSA-C.Cr.P. Article 770(3) prohibits both direct and indirect references to the defendant's failure to testify. Even without these statutory prohibitions, a prosecutor would not be free to comment upon a defendant's failure to take the stand since such a comment violates the Self-Incrimination Clause of the Fifth Amendment made applicable to the states through the Fourteenth Amendment. See Griffin v. California, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965); State v. Fullilove, 389 So.2d 1282, 1283 (La.1980).
When the prosecutor makes a direct reference to the defendant's failure to take the stand, a mistrial should be declared. In the case of such a direct reference, a reviewing court will not attempt to determine the effect that the remark had on the jury. State v. Johnson, 541 So.2d 818, 822 (La.1989); State v. Fullilove, 389 So.2d at 1284.
Where the reference to the defendant's failure to testify is not direct, the reviewing court will inquire into the remark's intended effect upon the jury in order to distinguish indirect references to the defendant's failure to testify (which are impermissible) from general statements that the prosecution's case is unrebutted (which are permissible). State v. Johnson, 541 So.2d at 822; State v. Burkhalter, 428 So.2d 449, 453 (La.1983).
According to the Johnson court, when the jurisprudence speaks of the need to ascertain the "intention" of a prosecutor's reference to the unrebutted nature of the state's case, the jurisprudence does not envision the impossible task of reading what was actually in the prosecutor's mind at the time the reference was made. Instead, the test to be employed for determining the "intent" of such a reference is as follows.
In cases where the prosecutor simply emphasized that the state's evidence was unrebutted, and there were witnesses other than the defendant who could have testified on behalf of the defense but did not do so, the Louisiana Supreme Court has concluded that the prosecutor's argument did not constitute an indirect reference to the defendant's failure to testify. State v. Johnson, 541 So.2d at 822; State v. Smith, 433 So.2d 688, 697 (La.1983); State v. Latin, 412 So.2d 1357, 1362-1363 (La.1982). On the other hand, where the defendant is the only witness who could have rebutted the state's evidence, a reference to the testimony as uncontroverted or unrebutted focuses the jury's attention on the defendant's failure to testify and mandates a mistrial. State v. Johnson, 541 So.2d at 822; State v. Harvill, 403 So.2d 706, 710-711 (La.1981); State v. Perkins, 374 So.2d 1234, 1237 (La.1979).
In this case, the prosecutor first stated that the victim's testimony was uncontradicted and then stated that no one had taken the stand to say that her testimony was untrue.
Doe's testimony revealed that she and defendant were the only two persons present in her home at the time of the commission of the instant offenses. The defense was that defendant's conduct was with Doe's consent and Doe testified directly contrary to this defense. Since there were no other persons present during the commission of these offenses, it is obvious that defendant was the only person who could have taken the witness stand to contradict Doe's testimony concerning the commission of the instant crimes and/or to say that testimony was untrue. The prosecutor's comment characterizing the testimony of the only witness to these crimes as uncontradicted and his further comment that "[n]o one took the stand and said that *699 what she said wasn't true," constitutes indirect reference to defendant's failure to take the stand in violation of LSA-C.Cr.P. Article 770(3). See State v. Johnson; State v. Perkins.
LSA-C.Cr.P. Article 770(3) provides that the trial court "shall" declare a mistrial when the prosecutor "refers directly or indirectly to ... [t]he failure of the defendant to testify in his own defense..." Pursuant to LSA-C.Cr.P. Article 5, the use of the word "shall" rather than "may" in LSA-C.Cr.P. Article 770 makes it mandatory that a request for a mistrial be granted if the requested mistrial is based properly on a remark or comment proscribed by LSA-C.Cr.P. Article 770. Accordingly, because the proscription in LSA-C.Cr.P. Article 770(3) was violated in this case, the trial court erred by failing to declare a mistrial. State v. Johnson, 541 So.2d at 823. However, we find no reversible error because we find the prosecutor's violation of La.C.C.P. art. 770(3) to be harmless error.
Although the Louisiana Supreme Court has not definitely decided whether a harmless error analysis is ever applicable to a violation of La.C.C.P. art. 770(3), it has not precluded such an analysis either. See State v. Johnson, 541 So.2d at 823, and State v. Jackson, 454 So.2d 116, 118 (La. 1984), in each of which the Louisiana Supreme Court addressed harmless error. In Johnson, the Court questioned whether a harmless error inquiry is ever appropriate where there has been a violation of La. C.C.P. art. 770(3), yet concluded that if a harmless error analysis is applicable to such an error, the Court could not say that the error in Johnson was harmless. On the other hand, in Jackson (after concluding that there was no Article 770(3) violation in that case), the Louisiana Supreme Court stated that even if there was such a violation, it was harmless. Accordingly, we choose to apply a harmless error analysis in this case. See Justice Lemmon's dissent in Johnson, 541 So.2d at 830, and particularly his footnote 1.
In Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), the question presented was whether a Griffin v. California error (prosecutor's comment on defendant's failure to take the stand) was per se error necessitating an automatic reversal or whether the conviction could be affirmed on the basis of harmless error; the Chapman Court rejected a per se rule. In United States v. Hasting, 461 U.S. 499, 508, 103 S.Ct. 1974, 1980, 76 L.Ed.2d 96 (1983), the Court found that error in the prosecutor's reference to defendants' failure to testify was harmless. Also see, Arizona v. Fulminante, ___ U.S. ___, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991) in which the Court concluded that the harmless error rule adopted in Chapman is applicable to the admission of involuntary confessions. In accordance with the harmless error rule as enunciated by the Supreme Court, the question we must ask is: whether, absent the indirect references by the prosecutor to defendant's failure to take the stand, it is clear beyond a reasonable doubt that the instant jury would have returned the guilty verdicts. United States v. Hasting, 103 S.Ct. at 1981.
Indeed, it is difficult to imagine a more compelling case of guilt than that present in this case, i.e., Doe's testimony, the circumstance of defendant being found asleep in Doe's bed with the knife (that he used while committing the sexual crimes) shortly after Doe's escape from his control, and defendant's confession to the instant crimes. Hence, based on the entirety of the evidence, we are convinced beyond a reasonable doubt that the error relied upon was harmless. Compare United States v. Hasting.
This assignment lacks merit.

ASSIGNMENT OF ERROR NO. EIGHT:
By means of this assignment, defendant contends that the trial court erred by denying his motion for mistrial on the basis of the same alleged trial court errors defendant urged in assignments one, two, three, four, five, six and seven. Because we found each of these assignments meritless, assignment of error eight is also without merit.

*700 ASSIGNMENT OF ERROR NO. NINE:
By means of this assignment, defendant contends that his sentences for his aggravated crime against nature and aggravated burglary are excessive. Additionally, he argues that the trial court erred by failing to adequately comply with the sentencing guidelines in LSA-C.Cr.P. Art. 894.1 and by ordering that his sentence for the aggravated crime against nature run consecutively to the sentences for the aggravated rape and aggravated burglary.
Article I, § 20, of the Louisiana Constitution prohibits the imposition of excessive punishment. Excessiveness of a sentence is a question of law which is reviewable. See State v. Sepulvado, 367 So.2d 762 (La.1979). A sentence may be excessive either by reason of its length or because the circumstances warrant a less onerous sentencing alternative. State v. Tate, 506 So.2d 546, 552 (La.App. 1st Cir.), writ denied, 511 So.2d 1152 (La.1987). In other words, a sentence may be both within the statutory limits and constitutionally excessive. State v. Sepulvado, 367 So.2d at 767. A sentence is excessive when it is grossly out of proportion to the severity of the offense or nothing more than the needless and purposeless imposition of pain and suffering. To determine whether a penalty is grossly disproportionate to the crime, the court considers the punishment and the crime in light of the harm to society and whether the penalty is so disproportionate as to shock our sense of justice. State v. Bonanno, 384 So.2d 355, 358 (La.1980). Because of the wide discretion afforded the trial court in imposing sentence, a sentence within statutory limits will not be set aside as excessive in the absence of a manifest abuse of discretion. State v. Payne, 540 So.2d 520, 524 (La.App. 1st Cir.), writ denied, 546 So.2d 169 (La.1989).
A trial court's reasons in imposing sentence, as required by LSA-C.Cr.P. Art. 894.1, are an important aid to this Court when reviewing a sentence alleged to be excessive. State v. Hicks, 554 So.2d 1298, 1305 (La.App. 1st Cir.1989), writ denied, 559 So.2d 1374 (La.1990). The trial court need not recite the entire checklist found in LSA-C.Cr.P. Art. 894.1. However, the record must reflect that the court adequately considered the guidelines. State v. Davis, 448 So.2d 645, 653 (La. 1984). Even when the trial court has not complied with LSA-C.Cr.P. Art. 894.1, this Court need not remand the case for resentencing unless the sentence imposed is apparently severe in relation to the particular offender or the offense committed. State v. Carr, 530 So.2d 579, 592 (La.App. 1st Cir.), writ denied, 533 So.2d 354 (La. 1988), cert. denied, 489 U.S. 1098, 109 S.Ct. 1573, 103 L.Ed.2d 939 (1989).
LSA-C.Cr.P. Art. 883 provides in pertinent part as follows:
If the defendant is convicted of two or more offenses based on the same act or transaction, or constituting parts of a common scheme or plan, the terms of imprisonment shall be served concurrently unless the court expressly directs that some or all shall be served consecutively.
However, even if convictions arise out of a single course of conduct, consecutive sentences are not necessarily excessive. State v. Ortego, 382 So.2d 921, 923 (La.), cert. denied, 449 U.S. 848, 101 S.Ct. 135, 66 L.Ed.2d 58 (1980). Other factors must be taken into consideration in making this determination. For instance, consecutive sentences are justified when the offender poses an unusual risk to the safety of the public. State v. Jett, 419 So.2d 844, 852 (La.1982); State v. Ferguson, 540 So.2d 1116, 1123 (La.App. 1st Cir.1989). Furthermore, maximum sentences are appropriately imposed only for the most serious violation of the described offense and for the worst kind of offender. State v. Chaney, 537 So.2d 313, 317 (La.App. 1st Cir.1988), writ denied, 541 So.2d 870 (La.1989).
Aggravated rape is punishable by life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence. LSA-R.S. 14:42C. Aggravated crime against nature carries a sentence of imprisonment at hard labor without benefit of parole, probation or suspension of sentence for a minimum of three and a maximum of fifteen years. LSA-R.S. *701 14:89.1B. Aggravated burglary carries a penalty of imprisonment at hard labor for not less than one nor more than thirty years. LSA-R.S. 14:60. For his aggravated rape conviction, defendant was sentenced to the mandatory term of life at hard labor without benefit of parole, probation, or suspension of sentence. He received the maximum sentence of imprisonment at hard labor for fifteen years without benefit of parole, probation, or suspension of sentence for his aggravated crime against nature conviction. For the aggravated burglary conviction, defendant was sentenced to imprisonment at hard labor for the maximum term of thirty years. The trial court ordered that the sentences for the aggravated rape and aggravated burglary run concurrently and that the sentence for the aggravated crime against nature run consecutively to the other two sentences.
The record reflects that the trial court ordered a presentence investigation report. The report reveals that defendant, who was born on December 7, 1962, has an extensive juvenile record and is classified as a second felony offender on the basis of a May 29, 1985 obscenity conviction. The instant offenses were committed approximately two weeks after the obscenity conviction.
The presentence investigation report concludes with a recommendation that (in addition to the mandatory life sentence for the aggravated rape) defendant be sentenced to the maximum terms of imprisonment for his aggravated crime against nature and aggravated burglary convictions and that all three sentences run consecutively. The report bases this recommendation on several factors including the severity of the instant crimes, the victim's overall condition as a consequence of the offenses, defendant's extensive criminal history as a juvenile and an adult, defendant's past poor performance during periods of probation as a juvenile and an adult, and the number of crimes against the person for which defendant has been arrested. The report also states that defendant must be considered an extreme threat to society, that he has no redeeming qualities, and that it is the belief of the Division of Probation and Parole that if defendant were released he would revert to criminal activity and particularly crimes against the person.
At the beginning of defendant's sentencing hearing, the trial court took cognizance of defendant's date of birth and noted that defense counsel had been given an opportunity to review the presentence investigation report. The court then gave defendant and his counsel an opportunity to make comments, which they declined.
In its initial sentencing remarks, the trial court reviewed the statement in the presentence investigation report that defendant gave to the probation and parole agent who prepared the report. The court stated that it had reviewed the victim's statement to the agent, which is also in the report and the court also noted that it had heard the victim's testimony at the trial. The court then reviewed defendant's juvenile and adult criminal records. In its review, the trial court noted that, as a juvenile, defendant had arrests for simple battery, burglary, attempted simple burglary, trespassing, simple escape, possession of marijuana, and four thefts; and that, as a juvenile, defendant had been adjudicated delinquent three times. For each adjudication of delinquency, defendant had received a suspended disposition. The court noted that defendant's juvenile record was lengthy, indicating to the court that defendant was not amenable to probationary treatment.[8] In reviewing defendant's adult criminal record, the trial court noted that, in addition to a DWI conviction and defendant's felony convictions for obscenity and the instant offenses, defendant had arrests for criminal conspiracy to commit simple burglary, possession of marijuana, contributing to the delinquency of juveniles, hit and run driving, indecent exposure and purse snatching.
*702 In additional sentencing reasons, the trial court took cognizance of defendant's social history as reflected by the presentence investigation report and defendant's mental problems. In reference to the sentencing guidelines in LSA-C.Cr.P. Art. 894.1, the court noted that the victim had done nothing to induce or facilitate the commission of the instant offenses and that nothing could be done to compensate the victim for the psychological damages and injuries she had sustained. The court stated that it found no grounds tending to excuse or justify defendant's criminal conduct and no provocation for defendant's actions. The court remarked that defendant had to have contemplated the harm that his actions would cause the victim. Based on defendant's juvenile record and his adult criminal history, the court indicated that it felt defendant (although ineligible for probation) would likely commit other offenses if he were eligible and placed on probation. In that regard, the court noted that defendant had shown by his record that he was not likely to respond to probationary treatment. The court further noted that any lesser sentences would deprecate the seriousness of the instant crimes and that defendant needed correctional treatment within a custodial environment. In imposing the sentence for the aggravated crime against nature and ordering that it run consecutively to the other two sentences, the court commented that the acts constituting the aggravated crime against nature were acts additional to the other two crimes and totally uncalled for.
We find that the trial court adequately complied with the sentencing guidelines in LSA-C.Cr.P. Art. 894.1. The instant crimes fall within the category of the most serious violations of the described offenses, and defendant represents the worst kind of offender. He clearly poses an unusual risk to the safety of the public as reflected by his criminal history as a juvenile and an adult, the nature of the instant offenses, and the particular circumstances of the instant crimes during which defendant, while armed with a knife, repeatedly threatened the victim's life. Under these circumstances, we cannot say that the trial court abused its sentencing discretion in imposing the instant sentences.
This assignment lacks merit.
Accordingly, the convictions and sentences imposed by the trial court are affirmed.
AFFIRMED.
NOTES
[1] To protect the identity of the adult female victim, we will refer to her in this opinion by the fictitious name "Jane Doe".
[2] In additional testimony given by Doe, she noted that she was never married to defendant and that she absolutely had not authorized defendant's entry into her home on the date in question.
[3] At about 9:00 or 9:30 a.m., that morning, the police took Doe to the hospital. Dr. Merritt F. Melker, III, who qualified and was accepted by the trial court as an expert in the field of obstetrics and gynecology, physically examined Doe at a hospital. This examination disclosed no trauma to Doe's vaginal area. The only physical injury disclosed by the examination was a bruise on the left side of Doe's neck measuring about one inch by one inch, which according to the doctor had been sustained within a time frame not exceeding one day before the examination. Additionally, a vaginal smear detected non-motile sperm. Dr. Melker opined that, because the sperm was non-motile, it had been deposited within two to twelve hours prior to the examination.
[4] In determining whether or not the ruling on defendant's motion to suppress was correct, we are not limited to the evidence adduced at the hearing on the motion. We may consider all pertinent evidence given at the trial of the case. State v. Chopin, 372 So.2d 1222, 1223 n. 2 (La. 1979); State v. Brown, 481 So.2d 679, 683 n. 1 (La.App. 1st Cir.1985), writ denied, 486 So.2d 747 (La.1986).
[5] In Powers v. Ohio, ___ U.S. ___, 111 S.Ct. 1364, 113 L.Ed.2d 411, a white defendant objected to the State's use of peremptory challenges to remove seven black venire persons from the jury. The United States Supreme Court held that the Equal Protection Clause prohibits a prosecutor from using peremptory challenges to exclude otherwise qualified and unbiased persons from the petit jury solely by reason of their race, "a practice that forecloses a significant opportunity to participate in civic life." The Supreme Court further held that, while an individual juror does not have the right to sit on a particular petit jury, the juror possesses the right not to be excluded from serving on one on account of race; and the Supreme Court concluded that any defendant, regardless of his race, may raise the third-party equal protection claims of jurors excluded by the prosecution because of their race.

Under Batson v. Kentucky, which involves a black defendant, the United States Supreme Court set forth the procedure for the establishment of a prima face case of purposeful discrimination. Under this procedure, a defendant first had to show that he was a member of a cognizable racial group and that the prosecutor had exercised peremptory challenges to remove from the venire members of the defendant's race. Clearly, this initial showing is obviated by the holding in Powers v. Ohio.
[6] In Ford v. Georgia, ___ U.S. ___, 111 S.Ct. 850, 857, 112 L.Ed.2d 935 (1991), the United States Supreme Court recognized that a state court may adopt a general rule that a Batson claim is untimely if it is raised after the jury is sworn. The United States Supreme Court also observed that the requirement that a Batson claim be raised in the period between the selection of jurors and the administration of their oaths is a sensible one. 111 S.Ct. at 857.
[7] We note that under LSA-C.Cr.P. Art. 789, the calling and impanelling of one or two jurors to sit as alternate jurors is discretionary with the trial court rather than mandatory. See State v. Roberson, 225 La. 74, 72 So.2d 265, 268 (1954) on rehearing.
[8] The presentence investigation report reflects that, during probationary supervision for each of defendant's suspended dispositions, defendant was "far from a model probationer" and "constantly re-arrested."